UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MARSHARITA DAVON KIRKLAND,

                Plaintiff,

        v.

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

_____

DECISION & ORDER

15-CV-6002P

## PRELIMINARY STATEMENT

Plaintiff Marsharita Davon Kirkland ("Kirkland") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Supplemental Security Income ("SSI"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge. (Docket # 12).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 8, 11). For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and complies with applicable legal standards. Accordingly, the Commissioner's motion for judgment on the pleadings is granted, and Kirkland's motion for judgment on the pleadings is denied.

# BACKGROUND

## I.    Procedural Background

Kirkland protectively filed for SSI on July 29, 2010, alleging disability beginning on July 1, 2010, due to anxiety, depression, memory loss, a right knee injury, headaches, and a learning disability.  (Tr. 304, 308).[1]  On February 22, 2011, the Social Security Administration denied Kirkland's claim for benefits, finding that she was not disabled.[2]  (Tr. 115-16).  Kirkland requested and was granted a hearing before Administrative Law Judge Connor O'Brien (the "ALJ").  (Tr. 129, 142-60, 175-201, 213-36).  The ALJ conducted the hearing on January 23, 2013.  (Tr. 41-114).  Kirkland was represented at the hearing by her attorney, Justin Goldstein, Esq.  (Tr. 41, 211-12).  In a decision dated May 31, 2013, the ALJ found that Kirkland was not disabled and was not entitled to benefits.  (Tr. 21-30).

On November 5, 2014, the Appeals Council denied Kirkland's request for review of the ALJ's decision.  (Tr. 1-6).  Kirkland commenced this action on January 5, 2015, seeking review of the Commissioner's decision.  (Docket # 1).

## II.   Relevant Evidence[3]

### A.    Educational Records

Records from the Rochester City School District suggest that Kirkland had problems with attendance and experienced academic and behavioral difficulties, including suspensions.  (Tr. 386, 406, 425).  Kirkland was provided an Individualized Education Program

---

[1]  The administrative transcript shall be referred to as "Tr. __."

[2]  Kirkland had previously applied for and been denied benefits in a decision dated November 3, 2006. (Tr. 304).

[3]  Those portions of the treatment records that are relevant to this decision are recounted herein.  Kirkland does not challenge the ALJ's physical RFC assessment.  Thus, records pertaining to Kirkland's physical impairments are not summarized herein.

that classified her as emotionally disturbed and originally placed her in a 15:1 classroom setting. (Tr. 277).  Deterioration in her academic performance resulted in a transfer to a 12:1+1 classroom setting.  (Tr. 289).

> **B.**     **Medical Records**
>
> > **1.**     **Genesee Mental Health Center**

Treatment notes indicate that Miriam Iker ("Iker"), PhD, performed a psychological evaluation of Kirkland at the Genesee Mental Health Center ("GMHC") on January 17 and 24, 1992, when Kirkland was approximately seven years old.  (Tr. 592-96). During the evaluation, Iker administered the Wechsler Intelligence Scale for Children – Revised ("WISC-R") and the Kaufman Test of Educational Achievement – Brief Form ("K-TEA").  (*Id.*).

The evaluation notes indicate that Kirkland and her older sister were removed from their mother's care pursuant to a neglect petition.  (*Id.*).  The records suggest that her mother suffered from substance abuse issues and that the children were living with their grandmother.  (*Id.*).  Kirkland attended the second grade and was having significant difficulties. (*Id.*).  During the evaluation, Kirkland demonstrated distractibility, anxiety, and hearing and visual difficulties.  (*Id.*).  Testing results indicated that Kirkland's full-scale intelligence quotient ("IQ") was 84, placing her in the low average range of cognitive functioning.  (*Id.*).  Kirkland also demonstrated an eleven-point difference between her verbal and performance scores, which Iker found to be significant and suggestive of an ability to perform better on verbal activities. (*Id.*).  Results of the K-TEA test placed Kirkland in the significantly below average range in academic skills.  (*Id.*).  Iker recommended that Kirkland be referred to the Pediatric Developmental Evaluation Unit for a full assessment, that her hearing and vision be assessed, that she receive resource room assistance, and that she continue attending therapy sessions.  (*Id.*).

2.      **Jefferson Family Medicine**

Treatment notes indicate that Kirkland began receiving treatment at Jefferson Family Medicine in March 2006. (Tr. 453). On March 24, 2006, she attended an appointment with Karen Snow-Holmes ("Snow-Holmes"), FNP, and complained of anxiety. (Tr. 455-56). Kirkland reported that she was generally well and capable of caring for her home, children, and fiancée, but had been experiencing anxiety and felt like something was missing in her life. (*Id.*). Snow-Holmes recommended a comprehensive physical examination. (*Id.*).

On July 16, 2007, Kirkland attended an appointment with William H. Bayer ("Bayer"), MD, complaining of panic disorder and chest pain. (Tr. 461-62). Kirkland reported that she had suffered from anxiety for the previous two years and had developed shortness of breath. (*Id.*). Bayer counseled her to cease smoking and referred her to St. Mary's Mental Health to address her panic disorder. (*Id.*).

Kirkland attended another appointment with Bayer on August 15, 2011, in which she complained of a "flare of depression." (Tr. 543-45). She also reportedly suffered from anxiety, panic attacks, and increased stress. (*Id.*). During the appointment, Kirkland reported that she had been receiving mental health treatment from N. Davis, but had an issue with insurance and had to stop treatment suddenly. (*Id.*). Kirkland reported no difficulty sleeping or mood swings or suicidal ideation. (*Id.*). According to Bayer, she scored a 13 on the Beck scale for depression. (*Id.*). Bayer recommended that Kirkland maintain regular sleeping and eating routines and try to get out of her house on a regular basis. (*Id.*). He referred her to the behavioral unit for further treatment. (*Id.*).

On February 23, 2012, Kirkland attended an appointment with Bayer and complained of depression, chest pain, and marijuana dependence. (Tr. 550-52). Kirkland

reported that she was receiving counseling for her mental health issues and had an appointment with a psychiatrist scheduled for March.  (*Id.*).  Kirkland reported that she had suffered from sexual abuse as a child resulting in removal from her home at the age of five.  (*Id.*).  She indicated that she would like to start medication to address her depression.  (*Id.*).  Bayer prescribed Citalopram and encouraged her to maintain regular sleeping and eating schedules. (*Id.*).  He also encouraged her to attend her upcoming psychiatric appointment.  (*Id.*).

On May 21, 2012, Kirkland attended an appointment with Bayer and complained of foot pain, depression, and marijuana dependence.  (Tr. 579-81).  Kirkland reported that although she had attended mental health treatment, she had not followed up with her counselor and was discharged.  (*Id.*).  Kirkland reported that she had recently moved and was attempting to find mental health treatment closer to her new residence.  (*Id.*).  She complained of mood swings and racing thoughts.  (*Id.*).  She also reported that she continued to smoke marijuana approximately once per month.  (*Id.*).  To address Kirkland's depression, Bayer recommended that she discontinue Citalopram, maintain regular sleeping and eating schedules, get out of her house on a regular basis, and continue to seek mental health treatment.  (*Id.*).

Kirkland returned for a physical examination at Jefferson Family Health on June 22, 2012, and was evaluated by Christine Shade ("Shade"), FNP.  (Tr. 582-85).  Kirkland indicated that she continued to be interested in receiving mental health treatment, that she was going through a break up and had recently learned that she was pregnant with her third child. (*Id.*).  Shade indicated that she would determine whether Kirkland could receive mental health treatment at the Porch clinic.  (*Id.*).

3.      **Unity Mental Health**

On April 28, 2006, Kirkland attended an appointment with Leslie E. Stern-Gastel ("Stern-Gastel") for evaluation of her depressed mood upon referral from Bayer, her primary care physician. (Tr. 598-608). Kirkland reported a history of sexual and physical abuse and that she had been removed from her home at a young age. (*Id.*). She reported that she then lived with her grandmother, who was physically and verbally abusive. (*Id.*). She also reported experiencing traumatic events when she was placed in foster care and detention centers. (*Id.*). Kirkland reported feelings of depression since she was seven years old and that she experienced sleep disturbance, sadness, poor concentration, low self-esteem, and decreased energy. (*Id.*). She attempted to obtain her GED on several occasions, but experienced racing thoughts that prevented her from learning. (*Id.*). Stern-Gastel diagnosed Kirkland with major depressive disorder, recurrent and rule out post-traumatic stress disorder ("PTSD"), and Adult Attention Deficit Hyperactivity Disorder ("ADHD"). (*Id.*). She assessed a Global Assessment of Functioning ("GAF") of 70 and recommended individual therapy on a biweekly basis. (*Id.*). Kirkland was discharged from treatment on July 7, 2006 due to loss of contact. (*Id.*).

Kirkland was admitted for treatment at St. Mary's Mental Health Outpatient Clinic on July 29, 2009. (Tr. 447-51, 609-13). According to treatment notes, Kirkland was diagnosed with depressive disorder, not otherwise specified, and anxiety disorder, not otherwise specified, and was assessed a GAF of 60. (*Id.*). Her primary care physician and a mobile crises unit had referred her for treatment. (*Id.*). At the time of the referral, Kirkland was living in a shelter after she had ended a relationship with the father of her children and moved out of his house. (*Id.*). Kirkland reported suffering from depression and anxiety since she was young. (*Id.*). She lived with her grandmother until the age of twelve, when she was placed into the PINS

program.  (*Id.*).  Shortly after her PINS placement, she entered the foster care system and was in

and out of that system until she turned eighteen.  (*Id.*).  She reported that she had been forced to

see a psychiatrist and to take psychotropic medications.  (*Id.*).  Kirkland reported that she

suffered from a learning disability, which caused difficulties retaining information and

maintaining focus.  (*Id.*).  Kirkland attended four appointments over a five-month period, but was

ultimately discharged due to failure to attend appointments or to respond to outreach.  (*Id.*).

On August 29, 2011, Kirkland attended a mental health evaluation at Unity

Mental Health's Pinewild Mental Health Clinic.  (Tr. 556-65, 614-23).  Kirkland was evaluated

by Elizabeth Kingsley-Curran ("Kingsley-Curran"), MSW.  (*Id.*).  Kirkland was referred for

treatment by her primary care physician for evaluation of her mood changes.  (*Id.*).  Kirkland

reported a history of depression and that her symptoms included daily crying, feelings of sadness

and hopelessness, difficulty concentrating, and decreased interest in preferred activities.  (*Id.*).

Kirkland explained that she was angry with her mother, who had abused substances when she

was pregnant with Kirkland.  (*Id.*).  Kirkland also reported a history of foster and residential

placement between the ages of five and eighteen.  (*Id.*).  Kirkland reported that she did not

currently have a job, but hoped to work within the human services field in the future.  (*Id.*).

Kingsley-Curran diagnosed Kirkland with depressive disorder, not otherwise specified, and

assessed a GAF of 60.  (*Id.*).

Kirkland returned for an appointment with Kingsley-Curran on September 15,

2011.  (Tr. 566-68).  During the appointment, Kirkland complained that her depressive

symptoms had worsened.  (*Id.*).  Kingsley-Curran discussed intervention methods.  (*Id.*).

Kirkland returned for another appointment on October 6, 2011.  (Tr. 569-72).  During the

appointment, Kirkland presented as sad and discussed her depression and anxiety; she appeared

more euthymic by the end of the session.  (*Id.*).  Kingsley-Curran referred Kirkland for a psychiatric evaluation.  (*Id.*).

Kirkland did not return for another appointment until January 25, 2012. (Tr. 573-76).  According to Kirkland, she had not attended previously scheduled sessions due to transportation issues.  (*Id.*).  Kirkland reported continued feelings of depression accompanied by loss of energy and feelings of emptiness and hopelessness.  (*Id.*).  Kingsley-Curran recommended that Kirkland attend a trauma group and re-referred her for a psychiatric evaluation.  (*Id.*).

On April 5, 2012, Kirkland was discharged from treatment due to loss of contact. (Tr. 577-78).  The discharge notes indicate that Kirkland had a history of initiating treatment, but failing to attend subsequent appointments.  (*Id.*).  Kingsley-Curran presented the case for closure after Kirkland stopped returning her phone calls.  (*Id.*).

### 4.    **Midtown Therapy**

Treatment notes indicate that Kirkland began receiving mental health treatment at Midtown Therapy on March 22, 2011.  (Tr. 529-39).  According to the treatment notes, she was referred for treatment of anxiety by her primary care physician, and she attended four therapy sessions with Naomi Douglas Davis ("Davis"), MSSA, LCSW-R.  (*Id.*).  Kirkland changed residences and sought a referral for a mental health provider closer to her home.  (*Id.*).  Davis diagnosed Kirkland with major depression, recurrent, and PTSD.  (*Id.*).

### 5.    **The PORCH Counseling Group**

Treatment records indicate that Kirkland began receiving mental health treatment at the Providing Opportunities for Recovery and Courage for Healing Counseling Group ("PORCH") on January 28, 2013.  (Tr. 633-36).  Kirkland met with Dawn Wandel ("Wandel"),

CASAC, MSW Intern, on that date.  (*Id.*).  During the appointment, Kirkland reported that she was twenty-eight years old and had recently given birth to her fourth child.  (*Id.*).  She described a history of anxiety, depression, nightmares, and panic attacks and indicated that she had difficulty functioning in social and academic settings.  (*Id.*).  Kirkland reported that she frequently experienced sadness, loss of energy, emptiness, racing thoughts, anxiety, and crying spells.  (*Id.*).  Kirkland reported that she suffered from an auditory deficit and had a history of physical, psychological, and sexual abuse.  (*Id.*).  Kirkland demonstrated difficulty staying on task during the session.  (*Id.*).

Kirkland reported that she had been removed from her mother's care at the age of five and had lived with her grandmother until she was eleven, at which time she had been placed in several group homes.  (*Id.*).  Kirkland reported difficulties in school.  (*Id.*).  Kirkland stated that she had been in a car accident in 1999, which resulted in the death of three of her closest friends.  (*Id.*).  Kirkland reported that she had suffered from panic attacks since that event.  (*Id.*).  Kirkland reported previous employment as a housekeeper, cashier and packer, but that she had not worked during the previous four years due to her anxiety.  (*Id.*).  Wandel diagnosed Kirkland with PTSD (chronic), panic disorder with agoraphobia (by history), learning disorder not otherwise specified, and rule out major depression, social phobias and attention deficit disorder, and assessed a GAF of 43, indicating a serious impairment in functioning.  (Tr. 633-36, 642).  It was recommended that Kirkland met with Wandel on a weekly basis to receive Cognitive Behavioral Therapy for PTSD.  (*Id.*).

Kirkland attended appointments with Wandel on February 12, 19 and 26, March 21, and April 9 and 16, 2013.  (Tr. 643-49).  During those appointments, they discussed Kirkland working with VESID for employment training and initiating legal proceedings relating to child

custody and support.  (*Id.*).  During this time, Kirkland reported experiencing more positive

moods, increased energy, and improvement in her patience.  (*Id.*).  She was discharged from

treatment on April 30, 2013.  (Tr. 649).  According to the treatment notes, Kirkland made

progress in reducing her anxiety and depression symptoms, increasing social supports, reducing

racing thoughts, increasing coping and self-soothing skills, and increasing connections to fiscal

and educational supports.  (*Id.*).  Wandel opined that Kirkland's symptoms of anxiety and

depression were greatly reduced and referred her for further treatment with inspiration outreach

and transitions coaching.  (*Id.*).  Wandel assessed a GAF of 53 upon discharge.  (*Id.*).

     **C.**     **Medical Opinion Evidence**

     **1.**     **Kavitha Finnity, PhD**

On February 10, 2011, state examiner Kavitha Finnity ("Finnity"), PhD,

conducted a consultative psychiatric evaluation of Kirkland.  (Tr. 501-04).  Kirkland reported

that she lived with her children, aged nine months, three years and seven years.  (*Id.*).  Kirkland

reported she was not employed and had previously worked at a packing company and a grocery

store.  (*Id.*).  She reported that she had not previously been hospitalized for psychiatric issues and

had received mental health treatment at Unity Mental Health between September 2010 and

December 2010.  (*Id.*).  She indicated that she had an appointment to resume treatment in

February 2011.  (*Id.*).

According to Kirkland, she did not have difficulty sleeping and her appetite was

normal.  (*Id.*).  Kirkland reported depressive symptoms, including a dysphoric mood, crying,

irritability, loss of interest and energy, and social withdrawal.  (*Id.*).  She also reported suffering

from anxiety with panic attacks characterized by heart palpations, sweating, difficulty breathing,

and trembling, which occurred approximately once per week.  (*Id.*).  Kirkland also reported

difficulties with short-term memory and concentration.  (*Id.*).  Kirkland indicated that she was able to care for her personal hygiene, cook, clean, do laundry, shop, manage her money, and drive.  (*Id.*).  Kirkland also reported that she socialized with friends, had a fair relationship with her family, and enjoyed reading.  (*Id.*).

Upon examination, Finnity noted that Kirkland appeared appropriately dressed and well-groomed, with normal gait, motor behavior, posture, and eye contact.  (*Id.*).  Finnity opined that Kirkland had fluent, clear speech with adequate language, coherent and goal-directed thought processes, depressed affect, dysthymic mood, clear sensorium, full orientation, and average intellectual functioning with a general fund of information appropriate to her experience. (*Id.*).  Finnity noted that Kirkland's attention and concentration were intact.  (*Id.*).  Finnity found Kirkland's recent and remote memory skills to be mildly impaired.  (*Id.*).  According to Finnity, Kirkland could recall three out of three objects immediately and zero out of three objects after five minutes, and she could complete four digits forward and three backward.  (*Id.*).

According to Finnity, Kirkland could follow and understand simple directions, perform simple tasks, maintain a regular schedule, learn new tasks, perform complex tasks, make appropriate decisions, and relate with others, although she has some difficulty with attention and concentration, relating with others, and dealing with stress.  (*Id.*).  According to Finnity, Kirkland could manage her own finances, and her prognosis was fair, but would improve with treatment.  (*Id.*).

### 2. **V. Reddy, Psychology**

On February 18, 2011, agency medical consultant Dr. V. Reddy ("Reddy") completed a Psychiatric Review Technique.  (Tr. 510-23).  Reddy concluded that Kirkland's mental impairments were not severe.  (*Id.*).

### 3.   Davis's Opinion

On March 29, 2011, Davis completed a psychological and intellectual assessment for determination of employability regarding Kirkland's ability to perform work-related activities, the relevant portions of which are discussed herein.  (Tr. 624-28).  On the form, Davis indicated that Kirkland had recently become a patient and she had only evaluated her on one occasion.  (*Id.*).  Davis opined that Kirkland suffered from major depressive disorder, recurrent, and assessed a GAF of 58.  (*Id.*).  According to Davis, Kirkland was moderately limited[4] in her ability to follow, understand and remember simple instructions and directions, perform simple and complex tasks independently, and maintain attention and concentration for role tasks.  (*Id.*).  Davis opined that Kirkland had no evidence of limitations in her capacity to regularly attend to a routine and maintain a schedule, maintain basic standards of hygiene and grooming, and perform low stress and simple tasks.  (*Id.*).  She also opined that for the next six months Kirkland would be unable to participate in any activities other than treatment or rehabilitation, including work.  (*Id.*).  According to Davis, Kirkland was experiencing depressive symptoms that negatively impacted her ability to focus and to follow instructions in a work environment.  (*Id.*).

### 4.   Kingsley-Curran's Opinion

On September 16, 2011, Kingsley-Curran completed a psychological and intellectual assessment for determination of employability regarding Kirkland's ability to perform work-related activities, the relevant portions of which are discussed herein. (Tr. 629-32).  On the form, Kingsley-Curran indicated that Kirkland had recently begun treatment and that she had only evaluated her on three occasions.  (*Id.*).  Kingsley-Curran opined that Kirkland suffered from depressive disorder, not otherwise specified.  (*Id.*).  According to

---

[4]  Moderately limited was defined to indicate an inability to function 10-25% of the time.  (*Id.*).

Kingsley-Curran, Kirkland was moderately limited[5] in her ability to perform simple and complex tasks independently, and maintain attention and concentration for role tasks, regularly attend to a routine and maintain a schedule, maintain basic standards of hygiene and grooming, and perform low stress and simple tasks. (*Id.*). Kingsley-Curran opined that Kirkland had no evidence of limitations in her capacity to follow, understand, and remember simple instructions and directions. (*Id.*). She also opined that for the next three to six months Kirkland would be unable to participate in any activities other than treatment or rehabilitation, including work. (*Id.*).

III.   **Non-Medical Evidence**

In her application for benefits, Kirkland reported that she was born in 1984. (Tr. 304). Kirkland reported that she had completed the tenth grade in a special education classroom setting. (Tr. 309). According to Kirkland, she had previously been employed as a factory worker, a housekeeper, and a cashier. (Tr. 309, 333). At the time of her application, Kirkland was working part-time at a factory. (*Id.*).

According to Kirkland, on a typical day she cares for her children, prepares meals, goes to work, and cleans. (Tr. 320). Kirkland indicated that she is able to care for her own personal hygiene without assistance and can prepare meals daily. (Tr. 321-22). According to Kirkland, she is able to do laundry, shop, and pay bills, and leaves her house everyday. (Tr. 322-23). Kirkland does not have a driver's license, but is able to use public transportation. (*Id.*).

According to Kirkland, she sleeps all day if she can and sometimes socializes with others. (Tr. 324). She does not get along with her family because she blames them for issues in her life. (*Id.*). Kirkland stated that she is able to follow spoken and written instructions, does not

---

[5]   Moderately limited was defined to indicate an inability to function 10-25% of the time. (*Id.*).

have problems getting along with persons of authority, but does have difficulty paying attention and maintaining focus, and has difficulty with her memory and adapting to changes or stress. (Tr. 327).  According to Kirkland, she suffers from depression and anxiety, which cause difficulty sleeping, panic attacks, and memory loss.  (Tr. 321).

During the administrative hearing, Kirkland testified that she completed the tenth grade in a special education classroom setting and tried unsuccessfully to obtain her GED. (Tr. 50-51, 102).  Kirkland also failed her driver's test, and does not have a driver's license. (Tr. 54).  Kirkland reported previous work as a cashier and as a box packer in a factory. (Tr. 54-60, 89-98).  According to Kirkland, she was terminated from her cashier positions because she could not keep up with the work and her register drawer count was often short. (Tr. 98).  She testified that the factory positions were temporary in nature and she was never hired as a permanent employee.  (Tr. 97-98).  She was never terminated from those jobs.  (*Id.*).

Kirkland testified that she lives with her four children aged nine, five, two and two weeks, and is generally able to care for them with assistance from her oldest child and occasional help from the children's father and her mother.  (Tr. 49, 86-87).  She assists her oldest two children in getting ready for school every day and spends the remainder of her day caring for her youngest two children and cleaning the house.  (Tr. 71-74).  According to Kirkland, she is able to wash dishes, clean the bathroom and living room, and vacuum without difficulty, although she needs assistance with laundry.  (Tr. 74-75).  Her mother helps her clean her house approximately every two weeks.  (Tr. 86).  Kirkland testified that she sometimes has difficulty completing cleaning tasks due to "losing track."  (Tr. 87).

Kirkland testified that she is able to care for her personal hygiene, although she does not shower approximately two days per week because she feels "not in tune."  (Tr. 71).

Kirkland testified that she grocery shops approximately twice per month. (Tr. 75, 85). Kirkland testified that although she spends the majority of the day in the house watching television and cleaning, she does leave her home to shop and attend appointments. (Tr. 60, 77, 100). She occasionally socializes with friends. (Tr. 101). According to Kirkland, she enjoys reading the comics in the newspaper and several different magazines. (Tr. 98-99). Kirkland testifies that she sometimes takes a nap during the day. (Tr. 83).

Kirkland testified that she is no longer able to work because she suffers from depression and anxiety. (Tr. 62). According to Kirkland, she is easily distracted and has difficulty remembering instructions. (*Id.*). Kirkland testified that she experiences numbness, loss of interest, depressed mood, and a longing to escape. (Tr. 78). She also testified that she experiences anxiety around others. (Tr. 79). She also suffers from panic attacks characterized by depression, racing thoughts, chest pain, headache, difficulty breathing, and loss of balance. (Tr. 79-82).

She testified that she was currently receiving mental health treatment from Wandel at the PORCH Group, who advised her to keep a journal. (Tr. 66-67). She was prescribed medication by Bayer, but reported that the medication was ineffective. (Tr. 67-69). According to Kirkland, she had difficulty in the past attending treatment due to transportation issues, but now takes medicab transportation to her appointments. (Tr. 84). She also discontinued treatment in the past due to insurance issues. (Tr. 85).

Vocational expert, Julie Andrews ("Andrews"), MPA, CRC, ABDA, CCCJS, also testified during the hearing. (Tr. 104-12, 243). The ALJ asked Andrews to characterize Kirkland's previous employment. (Tr. 105). According to Andrews, Kirkland previously had been employed as a hand packager. (*Id.*).

The ALJ asked Andrews whether a person would be able to perform Kirkland's previous job who was the same age as Kirkland, with the same education and vocational profile, and who was able to perform work at all exertional levels, but could only occasionally kneel or crawl and frequently climb ladders or stairs or stoop, crouch, balance or bend, and who was limited to unskilled work, could tolerate occasional changes in the work setting, but required consistent tasks even with an ebb and flow to the pacing, and was limited to occasional interaction with the public. (*Id.*). Andrews testified that such an individual would be able to perform the previously identified hand packager position and would also be able to perform other positions in the national economy, including table laundry laborer and industrial cleaner. (Tr. 106-07). The ALJ then asked Andrews whether jobs would exist for the same individual with the same limitations, except that the individual could not perform positions requiring hourly production rate work or teamwork, and her ability to interact with the public was further limited to no more than serving or giving and taking instructions, equivalent to the level seven or eight as categorized in the Dictionary of Occupational Titles ("DOT"). (Tr. 107). Andrews testified that such an individual would be able to perform the previously identified positions of laundry laborer and industrial cleaner, but would be unable to perform the hand packager position. (Tr. 108). The ALJ then asked Andrews to assume that the individual would be absent from work more than two days per month or would be below production standards approximately twenty percent of the time. (*Id.*). Andrews testified that such an individual would not be able to maintain employment on a full-time, competitive basis. (*Id.*).

Kirkland's attorney asked Andrews to assume the same limitations identified by the ALJ in the first hypothetical, but to also add the limitation that the individual would be unable to deal with changes in the work setting and would be unable to problem solve without

additional supervision.  (Tr. 109-10).  Andrews testified that those limitations would eliminate

the hand packager position.  (Tr. 110).  Kirkland's attorney asked Andrews how much

supervision was typically provided for unskilled work.  (Tr. 111).  Andrews testified that

unskilled workers are typically provided occasional supervision.  (*Id.*).  Kirkland's attorney then

asked whether unskilled jobs would exist for an individual who required more than occasional

supervision.  (*Id.*).  Andrews testified that such an individual would not be able to maintain

employment on a full-time, competitive basis.  (*Id.*).  Finally, Kirkland's attorney asked whether

an individual who was unable to understand and remember simple instructions and directions

and to perform simple and complex tasks independently ten percent of the time would be able to

maintain competitive employment.  (Tr. 112).  Andrews responded that such an individual would

not be able to maintain employment.  (*Id.*).

## DISCUSSION

## I.      Standard of Review

This Court's scope of review is limited to whether the Commissioner's

determination is supported by substantial evidence in the record and whether the Commissioner

applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004)

("[i]n reviewing a final decision of the Commissioner, a district court must determine whether

the correct legal standards were applied and whether substantial evidence supports the

decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also*

*Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo*

whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's

conclusions are supported by substantial evidence in the record as a whole or are based on an

erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C.

§ 405(g), a district court reviewing the Commissioner's determination to deny disability benefits

is directed to accept the Commissioner's findings of fact unless they are not supported by

"substantial evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to

any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is

defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401

(1971) (internal quotation omitted).

   To determine whether substantial evidence exists in the record, the court must

consider the record as a whole, examining the evidence submitted by both sides, "because an

analysis of the substantiality of the evidence must also include that which detracts from its

weight."  *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  To the extent

they are supported by substantial evidence, the Commissioner's findings of fact must be

sustained "even where substantial evidence may support the claimant's position and despite the

fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise."  *Matejka v.*

*Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d

60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

   A person is disabled if he or she is unable "to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A).  When assessing

whether a claimant is disabled, the ALJ must employ a five-step sequential analysis.  *See Berry*

*v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*).  The five steps are:

(1)     whether the claimant is currently engaged in substantial
        gainful activity;

(2)     if not, whether the claimant has any "severe impairment"
        that "significantly limits [the claimant's] physical or mental
        ability to do basic work activities";

(3)     if so, whether any of the claimant's severe impairments
        meets or equals one of the impairments listed in Appendix
        1 of Subpart P of Part 404 of the relevant regulations;

(4)     if not, whether despite the claimant's severe impairments,
        the claimant retains the residual functional capacity to
        perform his past work; and

(5)     if not, whether the claimant retains the residual functional
        capacity to perform any other work that exists in significant
        numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t

step five the burden shifts to the Commissioner to 'show there is other gainful work in the

national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383

(quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).


## II.     The ALJ's Decision

        In her decision, the ALJ followed the required five-step analysis for evaluating

disability claims.  (Tr. 21-30).  Under step one of the process, the ALJ found that Kirkland had

not engaged in substantial gainful activity since July 29, 2010, the application date.  (Tr. 23).  At

step two, the ALJ concluded that Kirkland has the severe impairments of major depressive

disorder, PTSD, learning disorder, not otherwise specified, history of right knee injury, and

recurrent headaches.  (*Id.*).  At step three, the ALJ determined that Kirkland does not have an

impairment (or combination of impairments) that meets or medically equals one of the listed

impairments. (Tr. 23-24). With respect to Kirkland's mental impairments, the ALJ found that Kirkland suffered from moderate difficulties in maintaining concentration, persistence or pace, and mild limitations in activities of daily living and maintaining social functioning. (*Id.*). The ALJ concluded that Kirkland had the Residual Functional Capacity ("RFC") to perform the full range of work at all exertional levels, but that she could only occasionally kneel and crawl and could frequently stoop, crouch, balance, and climb, and was limited to unskilled work and required consistent tasks (even with an ebb and flow to pace) and was able to work at a pace involving daily goals, but not hourly production rate work or teamwork, and could only tolerate occasional changes in the work setting and occasional interaction with the public at no more than the DOT people function level of serving (7) and giving/receiving instructions (8). (Tr. 25). At step four, the ALJ determined that Kirkland was unable to perform past work as a hand packer. (Tr. 28). Finally, at step five, the ALJ concluded that Kirkland could perform other jobs in the local and national economy, including laundry laborer and industrial cleaner. (Tr. 29). Accordingly, the ALJ found that Kirkland is not disabled. (*Id.*).

III.   **Analysis**

Kirkland contends that the ALJ's mental RFC determination is not supported by substantial evidence and is the product of legal error. (Docket # 8-1). According to Kirkland, the ALJ improperly formulated an RFC using her own lay opinion because the RFC was not supported by any medical opinion in the record. I disagree.

An individual's RFC is her "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis." *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999) (quoting SSR 96–8p, 1996 WL 374184, *2 (July 2, 1996)). When

making an RFC assessment, the ALJ should consider "a claimant's physical abilities, mental

abilities, symptomology, including pain and other limitations which could interfere with work

activities on a regular and continuing basis." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221

(N.D.N.Y. 2009) (citing 20 C.F.R. § 404.1545(a)). "To determine RFC, the ALJ must consider

all the relevant evidence, including medical opinions and facts, physical and mental abilities,

non-severe impairments, and [p]laintiff's subjective evidence of symptoms." *Stanton v. Astrue*,

2009 WL 1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd*, 370

F. App'x 231 (2d Cir. 2010).

"[A]n ALJ is not qualified to assess a claimant's RFC on the basis of bare medical

findings, and as a result an ALJ's determination of RFC without a medical advisor's assessment

is not supported by substantial evidence." *Dailey v. Astrue*, 2010 WL 4703599, *11 (W.D.N.Y.)

(internal quotation omitted), *report and recommendation adopted*, 2010 WL 4703591 (W.D.N.Y.

2010). Accordingly, although the RFC determination is an issue reserved for the Commissioner,

"[w]here the medical findings in the record merely diagnose [the] claimant's exertional

impairments and do not relate those diagnoses to specific residual functional capabilities," the

Commissioner generally "may not make the connection himself." *Deskin v. Comm'r of Soc.

Sec.*, 605 F. Supp. 2d 908, 912 (N.D. Ohio 2008) (internal quotation omitted).

As an initial matter, I conclude that the ALJ provided good reasons for giving

limited weight to the opinions submitted by Davis and Kingsley-Curran. Both Davis and

Kingsley-Curran are licensed clinical social workers. Accordingly, as recognized by the ALJ,

their opinions are not entitled to controlling weight; rather, they should be considered by the ALJ

when considering "the severity of the individual's impairment(s) and how it affects the

individual's ability to function." *Garcia v. Colvin*, 2015 WL 1280620, *5 (W.D.N.Y. 2015)

(quoting SSR 06-03P, 2006 WL 2329939, *2 (2006)).  In any event, as discussed above, both

opinions were rendered prior to the establishment by either provider of a significant treating

relationship with Kirkland.  Davis had evaluated Kirkland on only one occasion before giving

her opinion and Kingsley-Curran had met with Kirkland only three times prior to rendering hers.

*See Wright v. Colvin*, 2013 WL 3777187, *10, 15-16 (N.D.N.Y.) (ALJ properly discounted a

"checklist" opinion from a social worker who had only provided treatment for two months prior

to rendering opinion), *report and recommendation adopted*, 2013 WL 3777187, *1 (N.D.N.Y.

2013); *Patterson v. Astrue*, 2013 WL 638617, *8 (N.D.N.Y.) ("three examinations by [a

physician] over the course of four months . . . does not constitute the type of 'ongoing

relationship' that is required for finding that s/he is plaintiff's treating physician under the

relevant regulations") (citing 20 C.F.R. §§ 404.1502, 416.902), *report and recommendation

adopted*, 2013 WL 592123 (N.D.N.Y. 2013); *Cascio v. Astrue*, 2012 WL 123275, *3 (E.D.N.Y.

2012) (ALJ reasonably determined "that two isolated visits, approximately one year apart, did

not constitute an 'ongoing treatment' relationship rising to the level necessary for [the physician]

to qualify as a treating physician"); *Rylee v. Astrue*, 2010 WL 3039602, *7 (S.D. Ala. 2010)

("[t]he treating physician rule does not apply to a physician who bases his opinions of a

claimant's limitations on a limited number of visits"); *Seaton v. Astrue*, 2010 WL 2869561, *8

(N.D.N.Y. 2010) ("the ALJ's finding that . . . two visits did not constitute an 'ongoing treatment

relationship' is reasonable and shall not be disturbed by this [c]ourt"); *Redmond v. Astrue*, 2009

WL 2383026, *7 (N.D.N.Y. 2009) (finding doctor was not treating physician whose opinion was

entitled to controlling weight, noting it "appear[ed] that he only examined [p]laintiff on one

occasion"); *Sapienza v. Shalala*, 894 F. Supp. 728, 733 (S.D.N.Y. 1995) ("[t]he administrative

record provides substantial support for the ALJ's conclusion that [physician] was not a treating physician[;] [t]he record indicates that [he] had examined [plaintiff] only once").

Kirkland also maintains that the ALJ formulated the RFC without the benefit of any medical opinion of record and without making clear how she did so. (Docket ## 8-1 at 12-17; 13). According to Kirkland, the ALJ's conclusions that she was able to perform consistent tasks, meet daily production goals, tolerate occasional changes in the work setting, and engage in occasional interaction with the public were not supported by any medical opinion of record. (*Id.* at 14-15). A review of the ALJ's decision, however, demonstrates that she relied upon Finnity's opinion in formulating the RFC; indeed, the RFC is consistent with Finnity's opinion and adequately accounts for the limitations assessed by Finnity.

In her decision, the ALJ thoroughly discussed Finnity's opinion and specifically noted that Finnity assessed that Kirkland has some limitations in her ability to maintain attention and concentration, deal with stress, and relate adequately with others. (Tr. 28). The ALJ further noted that despite these limitations, Finnity concluded that Kirkland's attention and concentration were intact and that Kirkland was able to understand and remember simple directions and perform simple tasks, maintain a regular schedule, learn new tasks, perform complex tasks, and make appropriate decisions. (*Id.*).

Finnity opined that Kirkland had "some difficulty with attention and concentration." (Tr. 503). The ALJ accounted for this limitation in her RFC by limiting Kirkland to unskilled work involving consistent tasks even with an ebb and flow to pace. *See Steffens v. Colvin*, 2015 WL 9217058, *4 (W.D.N.Y. 2015) ("when medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work *despite limitations* in concentration, persistence, and pace, courts have concluded that limiting the

23

hypothetical to include only unskilled work sufficiently accounts for [attention and concentration] limitations"). Similarly, Finnity opined that Kirkland would have some difficulty relating with others. (*Id.*). The ALJ accounted for this limitation by limiting Kirkland to jobs that did not require teamwork and that had only occasional interaction with the public at no more than the DOT people function level of serving and giving/receiving instructions. (Tr. 25).

Finally, the ALJ's RFC also accounted for the stress-related limitations assessed by Finnity. Although Finnity identified "some" limitations in Kirkland's ability to manage stress, Finnity also determined that despite those limitations, Kirkland retained the ability to perform simple tasks, make appropriate decisions, learn new tasks, perform complex tasks, and maintain a regular schedule. (Tr. 503). Finnity's conclusions are consistent with the ALJ's conclusion that Kirkland was able to perform the basic mental demands of unskilled work. SSR 85-15, 1985 WL 56857, *4 (1985) ("[t]he basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions, to respond appropriately to supervision, coworkers and usual work situations, and to deal with changes in a routine work setting"). In addition to limiting Kirkland to unskilled work, the ALJ further accounted for Kirkland's stress and attention limitations by restricting Kirkland to positions requiring only consistent tasks at a pace involving daily goals, but not hourly production rates, and only occasional changes in the work setting. I conclude that the ALJ adequately accounted for the stress-related limitation identified by Finnity. *See Grogg v. Comm'r of Soc. Sec.*, 2014 WL 1312325, *1 (N.D.N.Y. 2014) (ALJ's determination that claimant could "handle a reasonable level of simple, repetitive work-related stress, and perform work-related activities effectively under stress" was not inconsistent with consultative examiner's opinion that claimant had "some difficulty dealing with stress").

Kirkland's challenge to the ALJ's reliance on Finnity's impermissibly "vague" opinion is similarly unavailing.  Although an expert opinion may describe a claimant's impairments in terms that are so vague as to render the opinion useless, the use of phrases such as "moderate" or "mild" by a consultative examiner does not automatically render an opinion impermissibly vague.  *See Rosenbauer v. Astrue*, 2014 WL 4187210, *16 (W.D.N.Y. 2014) (collecting cases).  In this case, Finnity provided an assessment after conducting a thorough examination of Kirkland, including requiring her to perform objective tests to assess her attention, concentration, and memory skills.  Finnity's opinion was based upon an examination of the claimant and adequately supported the ALJ's ultimate conclusions.  *See id.* (collecting cases).

Kirkland's challenge to the ALJ's decision appears rooted in the specificity of some of the limitations assessed by the ALJ.  (Docket ## 8-1; 16).  According to Kirkland, because each limitation assessed by the ALJ does not precisely correspond to a medical opinion in the record, remand is warranted.  Although the RFC must be supported by medical opinions, it is ultimately the ALJ's duty to formulate the RFC after evaluating the opinion evidence, treatment records, and the testimony of the claimant.  *See O'Neil v. Colvin*, 2014 WL 5500662, *6 (W.D.N.Y. 2014) ("the ALJ's RFC finding need not track any one medical opinion") (citing *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) ("although ALJ's conclusion did not perfectly correspond with any of the opinions of medical sources, ALJ was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole")).

Kirkland's reliance upon *Cosnyka v. Colvin*, 576 F. App'x 43, 46 (2d Cir. 2014), for a contrary result is misplaced.  (*See* Docket # 8-1 at 16).  In *Cosnyka*, the ALJ credited an

orthopedic examiner's opinion that the claimant would require "regular comfort breaks," which the ALJ translated into a limitation that the claimant would need a break for six minutes out of every hour. 576 F. App'x at 46. The Second Circuit determined that remand was appropriate because nothing in the record, including the medical records or the claimant's testimony, supported the ALJ's conclusion, and indeed some evidence was "to the contrary." *Id.* In this case, by contrast, the RFC formulated by the ALJ is supported by Kirkland's daily activities, sporadic and conservative mental health treatment, and Finnity's evaluation.

Indeed, other than the discounted opinions of Davis and Kingsley-Curran, Kirkland has failed to marshal any record evidence that is inconsistent with the limitations assessed by the ALJ. Nothing in the record suggests that Kirkland in unable to perform unskilled work with the limitations identified by the ALJ. I conclude that the ALJ's RFC assessment was based upon a thorough review of the record and was supported by substantial record evidence; accordingly, remand is not warranted. *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) ("[n]one of the clinicians who examined [claimant] indicated that she had anything more than moderate limitations in her work-related functioning, and most reported less severe limitations[;] [a]lthough there was some conflicting medical evidence, the ALJ's determination that [p]etitioner could perform her previous unskilled work was well supported").

## **CONCLUSION**

After careful review of the entire record, this Court finds that the Commissioner's denial of SSI was based on substantial evidence and was not erroneous as a matter of law. Accordingly, the ALJ's decision is affirmed. For the reasons stated above, the Commissioner's motion for judgment on the pleadings (**Docket # 11**) is **GRANTED**. Kirkland's motion for

judgment on the pleadings (**Docket # 8**) is **DENIED**, and Kirkland's complaint (Docket # 1) is

dismissed with prejudice.

**IT IS SO ORDERED.**


_____
             _s/Marian W. Payson_
              MARIAN W. PAYSON
              United States Magistrate Judge

Dated:  Rochester, New York
         March 4, 2016